UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
ADORE ME, INC.,                         :
                                        :
                    Plaintiff,          :        18cv4498 (DLC)
                                        :
          -v-                           :        OPINION AND ORDER
                                        :
NPC GLOBAL CORPORATION,                 :
                                        :
                    Defendant.          :
                                        :
----------------------------------------X

APPEARANCES:

For the Plaintiff:
Adam Stewart Katz
Heather M. Zimmer
Goldberg Segalla, LLP
711 3rd Avenue, Suite 1900
New York, New York 10017

For the Defendant:
Gregory A. Busch
The Busch Law Firm
P.O. Box 105
South Orange, New Jersey 07079


DENISE COTE, District Judge:

     This Opinion follows a bench trial held on July 23, 2019 in

this breach of contract action.  It concludes that defendant NPC

Global Corporation ("NPC") owes plaintiff Adore Me, Inc. ("AMI")

$166,030 plus prejudgment interest.

     In brief, NPC is a wholesaler that supplies boxes to

merchandisers.  It approached AMI and convinced AMI that it

could provide red holiday-themed boxes at a far lower price than

AMI's regular box supplier.  AMI sells women's apparel and ships its merchandise to its online customers in high-quality customized boxes.  The parties entered into a contract on August 18, 2017, which they modified on September 1.  That contract, as modified required NPC to deliver $231,800 worth of the customized red boxes to AMI by November 8.  As quickly became apparent, NPC could not provide boxes meeting the contract's specifications by the date on which the parties had agreed and still make a profit on the transaction.  Ultimately, NPC chose not to deliver any boxes to AMI and never returned the deposit AMI had given it for the transaction.

## Procedural History

This action was filed on May 21, 2018.  AMI asserted three causes of action: breach of contract, unjust enrichment, and fraudulent inducement.  AMI's unjust enrichment claim is brought in the alternative and seeks only recovery of the deposit that was paid to NPC and never returned.  NPC counterclaimed for breach of contract and unjust enrichment, but has withdrawn both counterclaims.[1]

Following the conclusion of discovery, and in anticipation of a bench trial, the parties filed on April 30, 2019 a pretrial

---

[1] NPC withdrew its counterclaim for unjust enrichment in the Joint Pretrial Order filed by the parties on April 30, 2019, and withdrew its counterclaim for breach of contract on the day of trial.

order with proposed findings of fact and conclusions of law.
The defendant also filed a pretrial memorandum, to which the
plaintiff responded on May 7.  Also on April 30, AMI filed a
motion in limine to preclude the introduction of parol evidence
to the extent it contradicts the terms of the parties' Purchase
Order dated August 18, 2017, and a subsequent agreement dated
September 1, 2017.  That motion was granted in a Memorandum
Opinion and Order filed July 3, 2019, with which familiarity is
assumed.  Adore Me, Inc. v. NPC Glob. Corp., 18cv4498(DLC), 2019
WL 2866043 (S.D.N.Y. July 3, 2019).

    With the parties' consent, direct testimony was taken
through affidavits submitted with the pretrial order.  The
parties also served copies of all exhibits and deposition
testimony that they intended to offer as evidence in chief at
trial with the pretrial order.  By letter dated July 22, the
parties stipulated that the deposition excerpts identified in
the Joint Pretrial Order would be included as part of the trial
record.  Since the principal evidence in this case is in the
form of the email communications between the parties, the
parties also waived their right to cross examine each other's
witnesses.  At the trial held on July 23, each party gave a
summation.  On the day of trial, NPC admitted that it was
required to return AMI's deposit.

AMI presented affidavits constituting the direct testimony of Nikhil Shetty ("Shetty"), a supply chain analyst at AMI, and Stan Waiche ("Waiche"), a purchasing manager at AMI. NPC submitted affidavits from Miriam Samuels ("Samuels"), a senior account executive at NPC, David Wieder ("Wieder"), a sales manager at NPC, and Jay Schlesinger ("Schlesinger"), NPC's CEO.

This Opinion presents the Court's findings of fact and conclusions of law. The findings of fact appear principally in the following Background section, but also appear later in the Opinion.

## Background

AMI designs and sells lingerie and other women's clothing both online and in stores. The bulk of its sales are completed online and AMI ships those goods to its customers in customized boxes. The box is a high-gloss colored box with a smooth surface. Until the summer of 2017, AMI's supplier for these boxes was InnerWorkings, Inc. ("InnerWorkings").

NPC Solicits AMI's Business.

In the spring of 2017, AMI began designing Christmas-themed packaging for the 2017 holiday season. Around this time, NPC account executive Samuels appeared unannounced at AMI's offices to solicit AMI's business. NPC is a wholesale supplier of boxes and other packaging.

AMI provided Samuels with a sample of the boxes that
InnerWorkings produced for AMI.  That box featured artwork on
the inside of the box and a smooth surface, and weighed 5.8
ounces.  AMI explained to Samuels that the design specifications
for the box were an important part of the "customer unboxing
experience" and the relatively low weight of the box helped keep
AMI's shipping costs down.  NPC represented that it could
replicate the InnerWorkings box and meet all of the AMI
specifications at a much lower cost than InnerWorkings was
charging, and that it could do so in time for AMI's holiday
shipments.

In June 2017, AMI sent NPC its Upstream Supply Guide
("USG"), an eighty-nine-page document (including appendices)
which contains its detailed requirements for vendors.  NPC Sales
Manager Wieder signed the USG on June 12, 2017, and his initials
appear at the bottom of each page of the signed copy.  Among
other things, the USG lists the fees ("chargebacks") AMI will
charge vendors for various non-compliance issues.  The
chargeback for "Delayed delivery based on the confirmed expected
date of delivery on the PO" is listed as "3% penalty of the
overall invoice and airfreight at vendor's expense after the 1st
day, then 5% incrementally every 7 days and order can be
cancelled."

During their negotiations, AMI provided NPC with its specifications for the bar codes which were to be printed directly on the boxes.  AMI required that the barcodes be "20mil," and be placed in a particular location on each box.[2] NPC confirmed to AMI that it could do so.  This representation was not entirely true.  NPC would have had to purchase new machinery for its manufacturer to print such barcodes, and NPC ultimately decided not to do so.

Before placing its order with NPC, AMI's Waiche requested that NPC provide AMI with a sample of the boxes.  NPC refused to do so, but again assured Waiche that NPC could produce a box that met AMI's specifications.

AMI Places an Order with NPC.

On August 17, following several months of negotiations, Shetty emailed Wieder and Samuels to confirm the terms of the agreement that the parties had negotiated.  Among other things, that email specified that 1) the delivery would be on or before October 23, 2017, 2) the boxes would have scannable 20mil barcodes on them, 3) AMI would pay a 1% deposit ten days after the placement of a purchase order, 4) NPC would "add the barcode on the artwork" displayed in an image attached to the email "for AMI to review and approve before producing samples", 5) the

_____

[2] "20mil" refers to the size of the narrowest bar of the barcode. This measurement affects the barcode's read rate and the distance from which a scanner can read the barcode.

6

boxes would meet certain weight requirements, 6) "samples need to be provided and approved before commencing production" and, importantly, that "Adore Me can not be taken as responsible if the requirements in the 'Details' above are not respected on the samples to be receive[d] for approval before production."

A few hours later, NPC wrote that it was "reviewing the terms with the factory" and "should know by tomorrow once we get the factory's agreement." Shetty responded that he "was under the impression all this was already been agreed upon by you and your team" and impressed upon NPC that "[t]his is [a] time sensitive order." A few minutes later, NPC responded: "As we agreed on this already, you can feel free to send the po asap. There is no reason to wait any longer." Shetty, unsatisfied, responded that he would send the purchase order only if NPC confirmed that it agreed to the terms. On August 18, NPC confirmed that the terms were agreed upon and Shetty should send the purchase order ("PO").

On August 18, Shetty emailed the PO to NPC. AMI's CFO was copied on the email.[3] The PO was for 420,000 small red boxes, 80,000 large red boxes, and 30,000 extra-large red boxes, for a

---

[3] The USG provides that "[n]o Purchase Order shall be considered final, and no contract will be found to exist, unless the Chief Financial Officer's signature is attached."

total price of $231,800.  This was the price selected by NPC.[4]
The PO specified that the delivery date would be October 23,
2017.  The email transmitting the PO directed NPC to "Please
make sure to revise all the details of the PO (style #,
quantities, prices, delivery location, delivery date, etc.) and
to notify us within 48 hours, upon reception of this email, of
any potential discrepancy."

Samuels confirmed receipt of the PO in an email also dated
August 18.  No one from NPC notified AMI of any changes that
needed to be made to the PO.

The email transmitting the PO also stated: "The deposit, if
not paid already, will be paid shortly.  As per our agreement,
the PO should only officially be considered as placed once the
deposit paid."  It further stated: "Please refer to our Upstream
Supply Chain Guide (USG) for more details on our compliance and
requirements."

Ten days later, NPC indicated that it wanted AMI to review
a "pre-pre-production" sample.  In a series of emails dated
August 28, Shetty made clear to NPC that AMI only wanted to
review "pre-production" samples meeting all of the
specifications previously agreed to.  Nonetheless, on August 28,

---

[4] NPC based this quotation upon its expectation that the boxes
would be produced in Turkey and shipped by ocean freight with an
8-10 week delivery time.  By August 31, NPC learned that it
would be "losing a substantial amount of money on this order"
because its manufacturer's prices had increased by 30%.

NPC dropped off a "pre-pre-production" sample at AMI's offices which showed the "color, print, and quality" of the box but not all of its features. On August 29, AMI's photo designer wrote to NPC that the artwork on the sample "looked great," but requested some modifications.

The Parties Modify Their Agreement: The September 1 Agreement.

On August 31, NPC advised Shetty that NPC would not be able to meet the terms of the agreed-upon August 18 PO. NPC indicated that the price of manufacturing the boxes had gone up 30%. NPC acknowledged that it had a contract, stating: "I understand we had an agreement." NPC indicated, however, that in order to move forward with the order, NPC would need a 25% deposit (as opposed to the agreed upon 1%), an extension on the delivery date (which had been October 23), and approval of samples, which would be the same as the deficient August 28 "pre-pre-production" samples.

Shetty immediately reached out to InnerWorkings for a quote on the cost of producing replacement boxes for the holiday season. He learned that it was too late to place an order for holiday boxes without a significant increase in price, as it was approaching peak season.

In a responsive email also dated August 31, Shetty informed NPC that AMI would increase the deposit from 1% to 25% and extend the delivery date from October 23 to November 8, so long

as NPC provided a sample by September 8 that met all of the agreed-upon specifications.  After a series of email exchanges, the parties came to an agreement on September 1 to a modification of their August 18 agreement.

In their revised agreement of September 1, AMI agreed to accept pre-production samples without artwork on the inside of the box, but insisted that the pre-production samples meet AMI's barcode requirements.  Shetty also insisted that the mid-production samples meet all of AMI's requirements, including artwork, and warned "if the mid production samples do [not] meet Adore Mes [sic] requirements on the account of NPC Global production capability, then NPC Global will be responsible for the reproduction of the boxes on their cost."  These requirements included that "[t]he boxes cannot have ridges like the sample that was given last week by NPC, for reference please see the Adore Me samples given to you already."  With respect to delivery date, Shetty wrote: "David confirmed it 8-10 weeks from PO placement, which was Aug 18th.  I can be flexible upto [sic] 11/8."  The reference to "David" is a reference to NPC's sales manager David Wieder.

NPC assured AMI that "We are aligned in the agreements set forth [in the September 1 emails.]  We are moving forward with the Pre production samples."  With this statement, the parties formed a new contract with a firm delivery date of November 8.

On September 14, AMI wired NPC a $57,950 deposit, which constituted 25% of the contract price.

On September 8, AMI's Shetty signed and returned a Quotation prepared by NPC. That Quotation contains the following terms: "Lead Time: 8-10 weeks"; "Pre-production samples with barcodes are available once a PO is placed"; and "Printing plates: NPC will waive the fee upon winning this business."

AMI Rejects NPC's September 8 Samples.

On Friday, September 8, NPC sent AMI pre-production samples. On Tuesday, September 12, AMI rejected the samples because they did not meet the contract specifications: The samples did not have artwork printed on the inside, did not have the proper barcodes printed directly on them, and had prominent ridges. Shetty reminded NPC that the finish and quality of the boxes had to be "exactly like the boxes given to you."

AMI Agrees in late September to Accept Non-Conforming Boxes.

The parties continued to discuss how to proceed through the weeks that followed the September 12 rejection of the sample boxes. Ultimately, by September 26, AMI agreed to accept boxes with ridges as shown on the samples, but insisted on compliance with the specifications regarding artwork and barcodes.

In mid-September, after a series of email exchanges regarding the feasibility of removing the ridges from the box,

NPC informed AMI that the only way to remove the ridges from the box would be to use a heavier paper, which would increase the weight of the boxes, and that its Turkish factory only used the paper contained in the sample. On September 14, NPC assured AMI, however, that NPC was still on track to meet the agreed upon delivery date of November 8, should AMI decide to go ahead with the order.

That same day, September 14, NPC raised for the first time the possibility of AMI cancelling the parties' agreement. It stated: "we are running out of time and need to make a decision if you are willing to go ahead as is or if you choose to not go ahead." AMI promptly responded that cancelling the order was not an option. It directed NPC to ensure that the boxes met each of the agreed upon weight and quality specifications.

The following morning, September 15, NPC again advised AMI that there was no way to both eliminate the ridges and meet AMI's weight requirements. When AMI continued to insist on the agreed-upon requirements, NPC responded: "I am sorry we can not [sic] meet these requirements. . . . There is nothing we can do at this point. We are at cut off time and must make a decision by today or early Monday morning." AMI did not budge and suggested that NPC "leverage your factory to source the right material and produce samples in order to meet our quality requirements."

Between September 15 and September 18, NPC notified AMI that it was talking to local manufacturers and exploring other ways of producing a box with the agreed-upon specifications.  On September 18, NPC informed AMI that using a local manufacturer would increase the price of the boxes by 40%, and there was no guarantee that the materials used by that manufacturer would be up to AMI's standards.  NPC warned AMI: "We are down to the wire, we either move forward as the samples or we do not."  AMI responded that it was "not ready to do a trade off between quality vs delivery date."  AMI indicated that it could not postpone its marketing campaign any further, reminded NPC that AMI had already granted an extension, and stated that the boxes needed to be delivered no later than November 3.  (This was five days earlier than the November 8 day to which the parties had agreed on September 1.)  NPC stated unequivocally that "if the quality will be to your satisfaction then we will need more time."  In response to AMI's inquiry whether the new manufacturer would be able to meet AMI's box specifications, NPC wrote:

> There is no guarantee that the product will be what
> you want.  I don't see that we will make it to
> November 3rd.  Samples weren't approved and therefore
> Production hasn't started, we need to start the whole
> process again.  I don't even have pricing yet, so that
> isn't a sure thing either.

On September 19, AMI offered to accept lower quality boxes for a discount, but refused to pay more, extend the delivery date or cancel the order.  It advised NPC that it had "no alternative for these red boxes."  It further reminded NPC that the sample box needed to have a "20mil" barcode.

On September 25, NPC informed AMI that it must choose one of three options going forward.  Those options were: 1) AMI would approve the samples with the ridges on the boxes at their current weight, NPC would correct the barcodes and artwork, and the products would be delivered six to eight weeks from sample approval; 2) new boxes would be produced without ridges at a heavier weight, one new sample would be produced, and if the sample was timely approved, the boxes would be delivered six to eight weeks from approval, and NPC would not be responsible for increased shipping costs; or 3) AMI would terminate the PO, NPC would return AMI's deposit, and the parties would release all claims against each other.  AMI immediately rejected these options and directed NPC to "move forward with the PO as per the terms of the agreement, and let us know what compensation can be done for us to approve boxes of a lower quality (ridges)."  NPC refused to provide AMI with any discount and informed AMI that "since samples were not approved yet, there is no way of us moving forward with the expected date of 11/3.  We need 6-8 weeks from sample approval."

On the evening of September 25, the parties spoke by telephone.  After that conversation, AMI agreed to accept boxes with prominent ridges, as shown in the September 8 samples.  AMI reiterated, however, that it did not approve of the artwork or barcodes on those sample boxes.  Specifically, the artwork was not centered on the outside of the box, no artwork was printed on the inside of the box, and the barcodes were printed in the wrong location on the box and were not 20mil.  AMI's concession regarding the ridges did not result in a new agreement.

AMI's October 18 Compromise:  Non-Conforming Boxes with November 13 Delivery Date

NPC never produced a sample that complied with AMI's barcode and artwork requirements.  On October 18, after some back and forth regarding barcodes, and having received assurances from NPC that the barcodes printed on the final boxes would meet its specifications, AMI finally approved the samples (albeit with a reminder that the final product needed artwork printed on the inside of the boxes).  On October 18, granted NPC an extension until November 13, which was five days beyond the November 8 deadline to which the parties had agreed on September 1.

On October 24, because of the short time remaining before the delivery date, NPC refused to begin production of the boxes on unless AMI signed a waiver of liability.  AMI refused to sign

a waiver, and asked NPC to find a way to expedite shipping.  NPC

reiterated that it had always needed samples to be approved six

to eight weeks before delivery of the boxes, and therefore could

not deliver the boxes by November 16 when the sample had only

been approved on October 18.

The parties' discussions deteriorated further.  On October

27, NPC demanded full payment before commencing production of

the boxes.  AMI refused.

Fearing that it would run out of boxes entirely and no

longer be able to make any shipments to its customers, AMI

switched its position.  On October 30, AMI offered NPC an

additional extension until December 13, which would accommodate

NPC's proposed six-week lead time, and agreed to waive

chargebacks for late delivery if the boxes were in fact

delivered by December 13.  Becoming even more desperate, on

November 6, AMI offered to accept delivery in two shipments: one

shipment of red boxes on December 13 and another shipment of

black or Valentines Day-themed boxes on January 15, 2018.

NPC did not respond to AMI's latest proposal until November

9.  NPC again proposed that AMI cancel the original PO and order

50,000 small boxes in any color, to be delivered in 6-8 weeks.

AMI repeated that cancelling the PO was not an option.

On November 10, NPC agreed that there was "no need" to

cancel the PO, but proposed that NPC "run one container" of

boxes if AMI signed a waiver releasing NPC from liability for chargebacks.  Finally, on November 14, AMI agreed to split production into two waves and release NPC from liability for any chargebacks pertaining to delayed delivery on the first wave as long as it was delivered by December 13.  AMI also agreed to waive any chargebacks pertaining to NPC's noncompliance with AMI's barcode requirements for the first shipment.  With respect to the second shipment, to be delivered January 10, AMI insisted that the barcodes be in compliance with AMI's original specifications.[5]

NPC continued to refuse to produce and deliver the boxes unless AMI signed a release, which AMI declined to do.  NPC never produced or delivered any boxes to AMI, and has not returned AMI's 25% deposit.

AMI Procures Substitute Boxes.

On November 17, 2017, AMI requested a quote for boxes from InnerWorkings, AMI's previous supplier.  Following negotiations, InnerWorkings sent AMI a formal quotation on December 1, for 420,000 small, 80,000 large, and 30,000 extra-large black boxes, meeting AMI's barcode, weight, and quality specifications, for a

---

[5] Although NPC's CEO asserted on November 16 that the PO had been premised on a "5Mil" barcode, that was not so.  More frankly, he admitted in that same email that NPC had decided not to invest in a machine that would produce the "20Mil" barcode until the parties had established a more permanent relationship.

total price of $339,880.  AMI placed that order on December 5, for delivery on February 22.

**Discussion**

The plaintiff seeks recovery on three theories of liability.  Its claim for unjust enrichment arises from NPC's retention of AMI's deposit.  At trial, NPC agreed that it must return that deposit to AMI.  AMI's claims for breach of contract and fraudulent inducement are addressed below.

I. Breach of Contract

To prevail on a claim for breach of contract under New York law, a plaintiff must establish "(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." Nick's Garage, Inc. v. Progressive Casualty Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (citation omitted).[6]  "To form a binding contract there must be a meeting of the minds, such that there is a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms."  Stonehill Capital Mgt. LLC v. Bank of the West, 28 N.Y.3d 439, 448 (2016) (citation omitted).  "Generally, courts look to the basic elements of the offer and the acceptance to determine whether there was an objective meeting

---

[6] Both parties rely on New York law in their trial submissions. See Arch Ins. Co. v. Precision Stone, Inc., 584 F.3d 33, 39 (2d Cir. 2009).

of the minds sufficient to give rise to a binding and
enforceable contract." Starke v. SquareTrade, Inc., 913 F.3d
279, 289 (2d Cir. 2019). "In determining whether the parties
intended to enter a contract, and the nature of the contract's
material terms, we look to the objective manifestations of the
intent of the parties as gathered by their expressed words and
deeds." Stonehill Capital Mgmt., 28 N.Y.3d at 448-49. Further,
under N.Y. U.C.C. § 2-207, which is applicable to a sale of
goods:

> (1) A definite and seasonable expression of acceptance
> or a written confirmation which is sent within a
> reasonable time operates as an acceptance even though
> it states terms additional to or different from those
> offered or agreed upon, unless acceptance is expressly
> made conditional on assent to the additional or
> different terms.

See also Aceros Prefabricados, S.A. v. TradeArbed, Inc.,
282 F.3d 92, 98 n.5 (2d Cir. 2002) (citing N.Y. U.C.C. § 2-
207).

When a contract is for the sale of goods for the price of
$500 or more, the contract is not enforceable unless there is
"some writing sufficient to indicate that a contract for sale
has been made between the parties and signed by the party
against whom enforcement is sought or by his authorized agent or
broker." N.Y. U.C.C. § 2-201(1). A writing is "signed" when it
contains "any symbol executed or adopted with the present
intention to adopt or accept a writing." N.Y. U.C.C. § 1-

201(37).  "Under New York law, emails constitute signed writings because a party's name at the end of his email signifies his intent to authenticate the contents."  RCC Ventures, LLC v. Am. DG Energy, Inc., 17cv3007(AJN), 2018 WL 1415219, at *4 (S.D.N.Y. Mar. 19, 2019) (citing Stevens v. Publicis, S.A., 854 N.Y.S.2d 690, 692 (1st Dep't 2008)).  When the contract is between merchants,[7] "if within a reasonable time a writing in confirmation of the contract and sufficient against the sender is received and the party receiving it has reason to know its contents," the contract is enforceable against the receiving party "unless written notice of objection to its contents is given within ten days after it is received."  Id. at § 2-201(2).

"[P]arties may modify a contract by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel."  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 783 (2d Cir. 2003) (citation omitted).  "Fundamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms."  Id. (citation omitted).

---

[7] A merchant is defined as "a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill."  N.Y. U.C.C. § 2-104(1).  The parties agree that both AMI and NPC are merchants.

August 18 Agreement

The parties agreed to their first contract on August 18, 2017 when NPC confirmed receipt of the PO (the "August 18 Agreement"). The PO clearly stated that AMI was to pay $231,800, with a 1% down payment, for 530,000 red boxes that were to be delivered by October 23. The August 18 Agreement also incorporated the specifications emailed to NPC by Shetty on August 17. These specifications included that the boxes would have artwork on the inside of the box, would have scannable 20mil barcodes on the bottom of each box, would have the same structure as the sample boxes previously provided to NPC, and would weigh 5.8 ounces or less (in the case of the small boxes).

The August 18 Agreement also incorporated the terms of the USG. Wieder's testimony that he did not understand the USG to be a binding contract when he signed it provides no help to NPC. Page 68 of the USG, which bears Wieder's signature, states:

> The USG Terms and Conditions together with the terms on the face of the order and order acknowledgement constitute the complete, final and exclusive statement of terms of the agreement between the parties pertaining to the subject matter hereof and supersedes all prior agreements, understandings and negotiations of the parties. The terms of any purchase order or other document issued by the seller in conjunction with this order shall be of no effect and shall not in any way extend or amend the Terms and Conditions of sale presented in the USG.

At summation, NPC argued that the Court's July 3 ruling on AMI's motion in limine to exclude parol evidence

precludes reference to the USG.  Not so.  The USG is not parol evidence -- it is part of the agreement between the parties.

NPC contends that the PO was not a binding contract, but rather a preliminary agreement or an "agreement to agree" that left material terms to future negotiations.  See Tractebel Energy Marketing, Inc. v. AEP Power Marketing, Inc., 487 F.3d 89, 95 (2d Cir. 2007).  NPC is incorrect.  The August 18 Agreement was a binding contract; there was no material term left open to future negotiations.

In any event, even a preliminary agreement may create a binding contractual arrangement.  NRP Holdings LLC v. City of Buffalo, 916 F.3d 177, 199 (2d Cir. 2019); Brown v. Cara, 420 F.3d 148, 153 (2d Cir. 2005); IDT Corp. v. Tyco Group, S.A.R.L., 23 N.Y.3d 497, 502-03 (2014).  The only type of preliminary agreement that does not create a binding contract is one that "reflect[s] agreement on certain major terms, but leav[es] other terms open for future negotiation," and thus "do[e]s not commit the parties to their ultimate contractual objective."  Brown, 420 F.3d at 153 (citation omitted).  In determining whether a preliminary agreement is an agreement of this type, courts consider:

> (1) whether the intent to be bound is revealed by the
> language of the agreement; (2) the context of the
> negotiations; (3) the existence of open terms; (4)

> partial performance; and (5) the necessity of putting
> the agreement in final form, as indicated by the
> customary form of such transactions."

Id. at 157.

NPC contends that the August 18 agreement left critical issues open, such as sample approval and the terms of delivery. It did not. As discussed above, the parties came to an unambiguous agreement with respect to delivery date. Before placing the PO, Shetty emailed NPC to confirm that the parties were in full agreement as to the terms of the contract. NPC confirmed that they were in agreement, and Shetty issued the PO. There is no indication in the PO or the emails regarding the terms of the agreement that any material terms were left to be negotiated. The language of the agreement clearly evidences an intent to be bound and the conclusion of negotiations.

NPC further contends that the PO was not a binding contract because it was not signed by AMI's CFO as required by the USG. This argument is puzzling, in light of NPC's contention that the USG was not a part of the parties' agreement. In any event, it fails. At no point did anyone at NPC object that AMI's CFO had not signed the PO, and NPC repeatedly expressed its understanding that the parties "had an agreement" in the days following August 18. See Dallas Aerospace, 352 F.3d at 783. Further, AMI's CFO had approved the PO and was copied on the email that transmitted the PO to NPC.

September 1 Modification

The parties modified the August 18 contract on September 1, 2017 after NPC notified AMI that it was unable to meet the terms of the August 18 Agreement.  After some back and forth on September 1, NPC stated "we are aligned in the agreements below."  This was a clear manifestation of NPC's intent to accept the modifications to the original contract outlined in the parties' September 1 correspondence.

The modified agreement (the "September 1 Agreement") provided that the delivery date would be 8-10 weeks from placement of the PO (which had occurred on August 18) but no later than November 8.  Nothing on the face of the September 1 Agreement suggested that sample approval was a pre-requisite to NPC's duty to perform the remainder of its obligations under the terms of the Agreement.[8]  In fact, AMI specifically rejected that proposal, and NPC accepted AMI's counter-proposal that the delivery date be 8-10 weeks from PO placement, but in any event no later than November 8.  In the September 1 Agreement, AMI

---

[8] NPC has submitted testimony from its own employees, Wieder and Samuels, that they "at all times" made clear to NPC that sample approval was a prerequisite to beginning production.  As the Court held in a July 2 Memorandum Opinion and Order on AMI's motion in limine, NPC may not resort to parol evidence to alter the unambiguous terms of the September 1 Agreement.  NPC's obligation to produce a pre-production sample that complied with the contract specifications did not make NPC's other duties contingent on that obligation.  Boxes that met all contract specifications remained due by the agreed-upon delivery date.

agreed to waive approval of a pre-production sample, but reserved the right to reject the shipment if the mid-production sample did not meet its requirements. Those requirements included, among other things, a smooth surface, 20mil barcodes, weight under 5.8 ounces, and artwork on the inside of the box.

"New York law requires that contract provisions specifying dates for performance be strictly enforced in a contract action at law." Towers Charter & Marine Corp. v. Cadillac Ins. Co., 894 F.2d 516, 523 (2d Cir. 1990). Time was of the essence in both the August 18 Agreement and the September 1 Agreement, as both agreements contain unambiguous delivery dates and there is no language to the contrary. Further, NPC was well aware that the red boxes were connected to a holiday-themed promotion. The clear import of the September 1 Agreement was that NPC needed to deliver compliant products before the last possible delivery date of November 8.

NPC failed to deliver any boxes to AMI at any time. Despite its representations that it could produce boxes meeting AMI's specifications, it quickly learned that its Turkish manufacturer could not. It also learned that it would be expensive to produce the quality of boxes called for by the contract. NPC also decided that it would not run the risk of starting production in Turkey unless AMI agreed to accept inferior boxes for the same contract price and waive its right

to a charge-back for late delivery.  Failing to get these
concessions, NPC decided to breach the September 1 Agreement.

Justifications for NPC's Breach

AMI's duty under the contract was to pay a deposit and pay
the remainder due upon delivery.  AMI paid the deposit, which it
had agreed to increase from 1% to 25%.  AMI having fully
performed under the contract, NPC was required to perform its
contractual obligations.  It did not.

NPC presents a series of arguments in an effort to excuse
its nonperformance of the contract.  First, it argues that AMI
acted in bad faith by (1) insisting upon "unreasonable" delivery
dates; (2) failing to approve the NPC sample boxes before
September 26, (3) requesting a discounted price for boxes that
were of lower quality than the InnerWorkings boxes that AMI
provided to NPC as samples, (4) requesting that NPC incur the
cost of air shipment in order to meet the agreed upon delivery
date; and (5) threatening NPC with chargebacks for late delivery
pursuant to the USG.

At no point did AMI act in bad faith.  The N.Y. U.C.C.
defines "good faith" in the case of a merchant as "honesty in
fact and the observance of reasonable commercial standards of
fair dealing in the trade."  N.Y. U.C.C. § 2-103(1)(b).
Insisting on compliance with agreed-upon contract terms is not
an action taken in bad faith.

As discussed above, the delivery date was unambiguously set forth in the August 18 Agreement, and was extended by AMI in the September 1 Agreement, where it was unambiguously set at November 8. AMI's repeated requests that NPC comply with its contractual obligation to deliver the agreed upon products by the agreed upon dates does not constitute bad faith. While NPC now complains that AMI should have extended the delivery date without threatening to impose a penalty for late delivery, AMI was under no contractual obligation to do so.[9]

Even though AMI advised NPC that it did not want to see pre-pre-production samples, it promptly gave NPC feedback on that sample within two business days of its receipt.[10] AMI also promptly responded to the September 8 sample NPC provided to it. Each was non-conforming. Although NPC now complains that AMI interfered with its performance of the contract by withholding approval of the sample until September 26, that argument misconstrues the record. NPC never provided a conforming sample

---

[9] The email correspondence between the parties appears to reflect some confusion as to the precise delivery date. It is sometimes given as November 3, and sometimes November 6. The terms of the September 1 Agreement control, however, setting the delivery date at November 8. There is no evidence that NPC took the steps necessary to supply the ordered boxes by any of these November dates.

[10] NPC emphasizes AMI's delay in selecting an appropriate color for the boxes, but the evidence reflects that that issue was resolved by August 31. AMI approved the color of the September 8 sample on September 12.

box to AMI.  In late September, AMI simply agreed to accept
boxes that did not conform to the contract specifications.
There was no delay, much less any unreasonable delay, by AMI.

A request for a discount in response to the presentation of
non-conforming goods is not evidence of bad faith.  NPC does not
contend that it ever provided AMI with a sample box that
conformed to the contract specifications.

Similarly, insisting that NPC incur the expense of air
freight if it were necessary to fly the boxes from Turkey to
meet the contract's delivery date is not evidence of bad faith.
NPC suggested the contract price, agreed to the specifications
for the boxes, and chose a foreign manufacturer.  It was NPC's
responsibility to perform the contract for the agreed upon
price.

Finally, as discussed above, the USG was signed by NPC's
representative, David Wieder, and his initials appear on each
page, including the page that alerts the seller that it may be
liable for chargebacks.  Indeed, the evidence at trial showed
that AMI ultimately offered several compromises to NPC when NPC
was unable to meet the terms of their agreement, including by
extending the agreed-upon delivery date.  Ultimately, AMI agreed
to waive the chargebacks if NPC delivered boxes on the new dates
it identified.

NPC next argues that it was justified in suspending performance or not performing. In support of its justification defense, it cites N.Y. U.C.C. §§ 2-609 and 2-610 and refers to "the instability of full payment explicitly threatened by AMI" and "instability with respect to the terms of delivery."

Section 2-609 allows a party to a contract for the sale of goods to suspend performance and demand assurance from the other party if "reasonable grounds for insecurity arise with respect to the performance of either party." N.Y. U.C.C. §§ 2-609; see also, Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp., 92 N.Y.2d 458, 464-436 (1998). Section 2-610 allows a party to suspend performance if the other party "repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other." N.Y. U.C.C. §§ 2-610; see also, DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111-112 (2d Cir. 2010).

For the same reasons discussed above with respect to AMI's purported bad faith, these arguments are misplaced. NPC never had reason doubt that AMI was able and willing to pay the amount due under the contract if NPC performed its obligations. The threat of a chargeback for late delivery of goods does not constitute a contract repudiation or present a ground for insecurity. NPC had no right to expect complete and timely

payment of the contract price if it failed to perform its obligations.

Finally, NPC argues that its failure to perform is excused because AMI refused its request that AMI terminate the contract. Under the UCC, "[t]ermination of a contract by one party except on the happening of an agreed event requires that reasonable notification be received by the other party." N.Y. U.C.C. § 2-309(3). AMI's refusal to terminate the contract does not excuse NPC's breach.

NPC does not suggest that the parties' contract contained an "agreed event" that permitted termination. Therefore, either party to the contract was permitted to terminate the contract based upon reasonable notice to the other. If one of the parties had done so, the law of contracts and the UCC describe the remedies available to the parties that would flow from that action. As AMI reminded NPC on November 9, "Cancelling the old PO is not an option. If you want to go that road you will be liable." Understanding the consequences of termination, neither party ever terminated the contract. NPC did not and neither did AMI.

NPC also argued in summation that it attempted to cancel the PO on September 14 and September 25. The evidence does not support this contention. Rather, NPC offered AMI the opportunity to cancel the contract, which AMI declined. This

cannot reasonably be read as NPC's own termination of the
contract.

Damages

AMI contends that it suffered damages from NPC's failure
to perform because 1) AMI never received any boxes from NPC, 2)
AMI has not received its deposit back from NPC, 3) AMI had to
obtain rush-order substitute boxes from InnerWorkings that were
more expensive than the boxes NPC was to provide, 4) AMI was not
able to launch a marketing campaign centered around the red
boxes, and 5) AMI was unable to use materials that it purchased
for use with the red boxes.  Besides the return of its deposit
of $57,950, AMI seeks in damages the difference between the NPC
contract price and the price it paid for replacement boxes.
That amount is $108,080.

"[T]he measure of damages for non-delivery or repudiation
by the seller is the difference between the market price at the
time when the buyer learned of the breach and the contract price
together with any incidental and consequential damages . . . ."
N.Y. U.C.C. § 2-713(1).

> Where the seller fails to make delivery or repudiates
> or the buyer rightfully rejects or justifiably revokes
> acceptance then with respect to any goods involved . .
> . the buyer may cancel and whether or not he has done
> so may in addition to recovering so much of the price
> as has been paid (a) 'cover' and have damages under
> [Section 2-712] . . . or (b) recover damages for non-
> delivery as provided in [Section 2-713]

31

N.Y. U.C.C. § 2-711.

Section 2-712 provides that a buyer may "cover" by "making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller."  When a buyer covers, it may recover from the seller as damages "the difference between the cost of cover and the contract price together with any incidental or consequential damages [as defined in Section 2-715], but less expenses saved in consequence of the seller's breach."  N.Y. U.C.C. § 2-712

AMI is entitled to recover the $57,950 deposit that it paid to NPC under N.Y. U.C.C. § 2-711(1).  It is also entitled to recover the difference between the cost of the covering boxes and the transaction price -- $108,080 -- under § 2-712.

AMI is also entitled to receive pre-judgment interest at the statutory rate of nine percent per annum.  N.Y. C.P.L.R. § 5001-5004; Capital Ventures Int'l v. Republic of Argentina, 552 F.3d 289, 296 (2d Cir. 2009) (prejudgment interest is a matter of right).  Pre-judgment interest is measured from the date of breach, which in this case is November 16, 2017.  N.Y. C.P.L.R. § 5001.  That is the date on which it became clear that NPC would not perform, even with AMI's proposed concessions, and when AMI sought replacement boxes.

In its complaint, AMI also asserts that it is entitled to lost profits and consequential damages as a result of the cancellation of its holiday marketing campaign, including the cost of tissue paper, stickers, and other materials that it purchased in connection with that campaign, to accompany the red boxes that it never received. AMI has not submitted any evidence, however, that it was unable to use these materials with other boxes. Nor has it submitted any evidence to quantify its lost profits or its consequential damages. AMI therefore may not recover these damages.

Mitigation of Damages

NPC argues that AMI failed to mitigate its damages. It contends that AMI should have sought to cover in September when NPC made clear that it could not deliver boxes with the agreed upon specifications.

Failure to mitigate damages is an affirmative defense. Travellers Int'l., A.G. v. Trans World Airlines, Inc., 41 F.3d 1570, 1580 (2d Cir. 1994). NPC therefore bears the burden of proving that AMI's requested damages are higher than they would be if they had been mitigated more promptly.

NPC has failed to show that AMI should have taken steps to mitigate before November 2017, or that the cost of cover would have been less if it had sought replacement boxes at anytime between September and November 2017. As the findings recited

above show, in response to NPC's representations that it would be unable to meet the agreed upon delivery date, AMI offered modifications to the contract to extend the delivery date and otherwise compromised on the terms of the agreement.  While AMI might have been justified in terminating the contract at the time it became clear that NPC could not perform, it chose not to do so, and instead opted to grant extensions and other concessions to continue to work with NPC.  When NPC finally declared that it would not perform notwithstanding AMI's multiple extensions and compromises, AMI promptly sought replacement goods from its previous supplier.

Further, NPC has not come forward with any evidence that AMI could have obtained boxes that conformed with its contract specifications at a lower price at any point in September or October 2017.  AMI began its planning to procure holiday boxes in the Spring of 2017.  There is absolutely no evidence that any supplier would have agreed in September to provide this large number of red holiday boxes to AMI at any time before AMI's holiday shipments to its customers were due to be made.

Nor is there any evidence that it would have cost AMI less than it agreed to pay InnerWorkings in November if it had ordered those boxes in any color in September on the condition that they be delivered in time for AMI's holiday shipments to its customers.  After all, the holiday season is the busiest

consumer season of the year and merchants begin their planning

for it many months in advance, as AMI did.  When AMI contacted

InnerWorkings in September, it learned that there was already a

significant price increase for holiday boxes.  NPC's own

manufacturer increased its prices in late August.  NPC has

therefore failed to prove its affirmative defense.

II. Fraudulent Inducement

AMI brings a fraudulent inducement claim premised on NPC's

representations in the summer of 2017 that it had the capacity

to produce a box of the kind and quality of the InnerWorkings

sample box that AMI gave to NPC in the summer of 2017, including

a box that had a 20mil barcode printed directly on the box.

Because AMI's claim for damages under its fraudulent inducement

claim is duplicative of the damages already awarded, it is

unnecessary to decide if recovery is otherwise permitted under

this cause of action.

"In New York, a plaintiff alleging fraud must show by clear

and convincing evidence that the defendant knowingly or

recklessly misrepresented a material fact, intending to induce

the plaintiff's reliance, and that the plaintiff relied on the

misrepresentation and suffered damages as a result."  Merrill

Lynch & Co. Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 181

(2d Cir. 2007).  A plaintiff may bring parallel contract and

fraud claims if the plaintiff "(1) demonstrates a legal duty

separate from the duty to perform under the contract; (2) points to a fraudulent misrepresentation that is collateral or extraneous to the contract; or (3) seeks special damages that are unrecoverable as contract damages." Id. at 183. "New York distinguishes between a promissory statement of what will be done in the future that gives rise only to a breach of contract cause of action and a misrepresentation of a present fact that gives rise to a separate cause of action for fraudulent inducement." Id. at 184.

It is unnecessary to decide if AMI has demonstrated that NPC owed it any extra-contractual legal duties. The requirement that a "20mil" barcode be printed on the box was a term of the August 18 and September 1 Agreements. NPC's representations as to its technical capabilities were therefore representations about its ability to perform under the contract. In any event, AMI may not recover more damages than have already been awarded for the breach of contract claim. AMI does not seek any special damages.

## Conclusion

For the reasons stated in this Opinion, the Clerk of Court shall enter judgment in favor of AMI in the amount of $166,030, plus prejudgment interest at nine percent per annum, to be

calculated from November 16, 2017.  The Clerk of Court is
further ordered to close this case.

Dated:    New York, New York
          July 29, 2019

                                    _____
                                         DENISE COTE
                                 United States District Judge